24-7022 United States v. Rainford. Mr. Sandiford. Good morning. I'm Dean Sandiford from the Federal Public Defender's Office and I'm here for Robert Rainford. Her brief raises three claims of instructional error and I'd like to start with the first, which is whether the list of disqualifying circumstances in the involuntary intoxication instruction misstated the law and may have caused the jury to convict Mr. Rainford on illegal grounds. That instruction told the jury to reject Mr. Rainford's defense if it found that he knew or had received warnings of the possible intoxicating effects of Adderall. It told the jury that those warnings could come from doctors, pharmacists, or anyone else familiar with the effects of Adderall. This instruction was legally wrong and allowed the jury to improperly convict Mr. Rainford just because he had received a standard printout from the pharmacy warning that Adderall can cause changes in behavior and mood. It allowed the jury to convict him just because his family and acquaintances told him they were concerned about how Adderall was affecting him. And it allowed the jury to convict him just because his former doctor told him his prescription exceeded FDA recommendations. All of that evidence may have been relevant to whether Mr. Rainford was at fault, but it was wrong for the court to instruct the jury that this evidence, if credited, defeated his defense as a matter of law. The Adderall was prescribed? The Adderall was prescribed. Did the evidence show he was taking, he was using a dosage higher than the prescribed amount? The evidence on that was conflicting. So he was prescribed an extremely high dosage of Adderall. It was either 90 milligrams at some time of extended release, 120 milligrams at other times, plus extended release to take on top of that as needed. So one of the things the government pointed to as evidence that he was taking more than he was prescribed was a single journal entry that indicated that he may have taken 180 on a prescription, maybe 200 on a prescription of 120. That wasn't necessarily inconsistent with his prescription because he was taking 120 of immediate release and then had extended release to take on top of that as needed. And what his doctor told him to do was take that when you have a long day in your truck and you need extra. And that was one of those days. And did the record show that he'd had previous, I'm just going to say psychotic events or confused reactions to the Adderall? The defense, well, Dr. Beeman testified that he was probably psychotic to some level from the point that he was taking 90 milligrams on. So it was for a few months before this killing happened. Anyway, was there evidence that the Adderall was causing, you know, insanity-type behavior? Absolutely. There was a lot of evidence of that. I mean, his parents said they had him come over and change the locks three times. He thought his garage doors were being widened, you know. But, you know, what Dr. Beeman and Dr. Johnson both testified to is that people who are suffering under this psychosis, they believe entirely in the reality that they're living in, even in the face of contrary evidence. So, you know, there's not a lot of on-point case law here, frankly. We're in a bit of uncharted territory, wouldn't you agree? There's not a lot of case law because this is a pretty unusual defense. There's a lot more in state courts than there are in federal courts. But the cases are clear, and I think they're consistent on, if a medication throws you into an uncontrollable frenzy, it's prescribed by your doctor. You're entitled to the defense if you have—if the reaction that you have is unusual and unexpected. Well, don't some of the cases subject—even if it's a prescribed amount, if you know the side effect is an uncontrolled frenzy, that, you know, even with—you know, that knowledge would basically obviate your entitlement to the defense. Yes, I do think that, but he never got warnings like that. The printout from the pharmacy that the judge's instruction said was enough to convict him just said Adderall can cause changes in behavior and mood. You know, the government points to one piece of evidence from Dr. Kirk where he may have suggested that the Adderall was making him psychotic, but that's not—the comment from Dr. Kirk was vague. It was offhand. Mr. Rainford had come in and described some of the things he was experiencing, and Dr. Kirk said it could be psychosis from the medication, didn't explain what that meant, didn't say which medication. He's on a lot of medications and sent Mr. Rainford on his way. And at the time, Mr. Rainford was already psychotic. The things that he was describing to Dr. Kirk were probably psychotic, but what the experts testified to is that people who are psychotic do not know that they're psychotic. They think that the reality that they're living in is a real reality, even when confronted with evidence. I mean, Dr.—Mr. Rainford's parents testified that, you know, they confronted him about it and said, look, we don't think your ex-wife is really trying to poison your food. And he was like, I'm absolutely sure she is. And both doctors testified that he saw no connection between the things that he was experiencing as real and the Adderall that he was taking. And he never got any warnings that that sort of thing was going to happen. Well, he never got any warnings from the doctors, maybe, but did—you know, he had a history of abusing the substance. I think that's well-documented in the records. Like when his parents or his ex-wife or whatever, would they approach him and say, hey man, when you're taking the Adderall, you're crazy. You need to back off that stuff. I'm going to start with the first point. It is not well-documented in the record that he was abusing Adderall. The only person who testified to that was his ex-wife, who wanted him to get the death penalty and openly testified that she hated him. The other evidence— I mean, that could be credited, though, even though you could argue—that's impeachment. Sure, it could be credited for sure. But again, that's why this was a jury question. And this instruction that the judge gave took that away from the jury. Okay, let's not get sidetracked on this, though. Did his parents tell him, we don't like you taking that stuff because when you take it, you act crazy? His parents apparently did tell him things like that. At the time, he was already psychotic from this medication and thought everything he was experiencing was real. And he wrote off what his parents said because they weren't doctors. His doctor was telling him he needed this medication and was prescribing it for him. He's a trained truck driver. He was told to trust his doctors, so he believed them over them. Did the ex-wife, although vindictive and who did not like him, when they were together was the evidence that she would tell him, don't take this stuff, it has a bad effect on you? I don't believe there was testimony like that. I don't believe there was testimony like that. I mean, yeah, there wasn't testimony like that. And in terms of other evidence of drug abuse, a lot of this stuff was—I'm sorry, it looks like you're— Was there evidence in the record that he himself was at least—I mean, we're getting way down the road after he's been taking this stuff for years—but was there evidence in the record that he had ever acknowledged that sometimes when he took too much it made him do crazy things? Absolutely not. There was no evidence of that. In fact, he thought that everything he was experiencing was real and normal. And he had been taking the medication for a long time, but it was only after he switched to Dr. Kirk that all of a sudden Kirk started upping this prescription. It was only at that point that the medication made him psychotic. So he'd been taking Adderall since 2008, it sounds like, for a very long time, but it was at a reasonable dose. He never had any problems. It was only this fateful decision to switch to this new doctor who was closer to home, and this guy prescribed him way, way too much. Didn't the record at least contain some evidence that he switched doctors because he didn't think he was getting enough from his old doctor? I mean, that's one way to read the evidence, but a much more persuasive way to read it is what he explained, is that, I switched doctors because he was closer to home and he could prescribe all of my medications. UK Psych couldn't prescribe some of his meds. So he switched to Dr. Kirk for that reason. And when he went to UK Psych to tell them about it, he didn't hide any of it from them. He was like, look, Dr. Kirk is giving me 90 milligrams, and they're like, well, we're not going to do that. The FDA says 60. But it wasn't like he was trying to get drugs from them and also get drugs from Dr. Kirk behind their back. He was very open with them about it. Counselor, can I ask you two questions about harmlessness analysis regarding destructional error? Sure. The first is, was the intent to kill element contested at all by Mr. Rainford at the trial? I don't think so. I mean, I think the intent to kill was fairly clear based on the evidence. Based on his video and the statements he made the day of the shooting? I think just based on the circumstances of the shooting itself, as we know them to be, you know, I don't think there was really any argument that it was an intentional killing. The insanity and involuntary intoxication isn't an intent negating element. It's when an insane person kills someone intentionally, they're excused because of their insanity. So how do we think about the sort of sequence or order of operations in the jury instructions about how the jury would go about making its findings as we then consider whether or not any error in the instructions would have contributed to the verdict? I'm not exactly sure what you're getting at, but... In other words, do the instructions tell the jurors sort of what order of operations they need to go under or proceed under when they're making decisions? Oh, I see what you mean. So the jury would go through the murder instruction first and decide that he intended to kill Mr. Scroggins, and only then would they go to involuntary intoxication. And for involuntary intoxication, one of the elements that they would need to find is innocent mistake. And that's where the problem comes in, is that this jury instruction defined innocent mistake in a way that ruled out entire categories of evidence that didn't preclude the defense. So the jury could read that innocent mistake instruction and say, well, he got a warning of possible intoxicating effects from his pharmacy printout. The instruction said pharmacist in it and said, well, that's it. He's not entitled to the defense. But that should not have precluded his defense. There was nothing in that pharmacy printout that should have precluded the defense at all, because it didn't warn him that this medicine could make him psychotic. That's the real problem with this instruction, is that it just short-circuited the jury's consideration of all the evidence we've been talking about this morning. You know, they looked at that instruction and said, well, you know, his family and friends said, we're concerned about how much Adderall you're taking. Under the instruction, that would be enough to preclude the defense, because it said, warnings of any intoxicating effects. But that's not legally correct. He has to have warnings that the medication could throw him into an uncontrollable frenzy, could make him unable to control his behavior. But the instruction didn't say that, because it defined intoxication to mean anything that can arouse passions, inhibit, you know, diminish inhibitions, cloud judgment. These are very vague, broad terms, and they don't capture involuntary intoxication. Counsel, can I ask you about your other instructional error argument, imperfect self-defense? What's a version of the evidence where the jury would reject involuntary intoxication, but could find involuntary manslaughter based upon imperfect self-defense, had that instruction been given? Sure. If they thought the intoxication was voluntary. If they thought, you know what, we think he is at fault for being intoxicated, but we agree that he was psychotic, as both protecting his daughter at the time. So these defenses are not, they're mutually exclusive in the sense that the involuntariness of the intoxication is not part of the imperfect self-defense. Almost all of this Court's imperfect self-defense cases involve voluntarily intoxicated defendants, people who are drunk, people who are high on meth. That's not, I mean, that's the reason the Court didn't give the instruction, is that's the mistake that the Court made. If it thought for imperfect self-defense, you had to have involuntary intoxication, but that's incorrect. Was the quantum of proof on the imperfect self-defense enough to get it to the jury? Yeah, absolutely. I think it was based on his statements during the interrogation. What he said during the interrogation was that Mr. Scroggins was in his house, that he was acting to protect his daughter, that he thought he shot Mr. Scroggins. That's not what he said at trial. It's not what he said. You're right. At trial, he said he didn't remember what he had said, but you look at the evidence in the light most favorable to the defense, even if it's weak and contradicted, if there's a version of the evidence, I mean, that supports the defense, the instruction has to be given. I mean, in Toledo, the kind of first case Judge Kelly wrote on this years ago now, he said, you know, this defense seems weak to me, but there's enough evidence to support it, and so it has to go to the jury. You know, he didn't connect the dots completely during his interrogation, but if you look at the video, he's in very poor shape. He's non-responsive. He's clearly visibly exhausted, but if you read what he said in the light most favorable to the defense, the jury could have inferred that this man in his psychotic state thought that this guy was in his house, thought he had raped his daughter, and thought he had to shoot him to protect her. We all know that that was wrong, but the jury heard convincing evidence that he was psychotic at the time, and essentially living in a different reality. Oh, I see I'm almost out of time. Yeah, you may reserve that time. Thank you. Let's hear from the United States, please. May it please the Court, Kevin Gross for the United States. If involuntary intoxication is a federal defense, then it is a subset of insanity, and in this case, the jury received an insanity instruction that has not been challenged on appeal. Furthermore, the jury received a voluntary intoxication instruction and rejected that. Rejected that there was intoxication that played a meaningful role in this case. Imperfect self-defense, on the other hand, is not a subset of insanity. Under 18 United States Code Section 17, evidence of mental health in a criminal trial is strictly limited to insanity, and while this court has created a narrow carve-out to permit evidence of diminished capacity in narrow cases to negate specific intent, it has never created, there's no case law that has ever created some sort of super diminished capacity that would permit a defendant to do an end run around the insanity defense. Counsel, I'm sorry, can I go back to your first sentence? You said if involuntary intoxication is a defense. Did the government at trial object to the defendant's proposed jury instructions on involuntary intoxication? At trial, during the charging conference, the government noted that it was not conceding that involuntary intoxication was a federal defense. I will note that the government permitted the lower standard of proof for the involuntary, not that the government can permit things, the government, of course, is not the court. The government didn't contest the lower standard of proof for the involuntary intoxication instruction preponderance instead of clear and convincing, frankly, for appellate purposes, because we were confident in the evidence and we wanted to give the defense the benefit of the doubt for purposes of appeal. But the correct standard of proof would be clear and convincing evidence if it, in fact, is a federal defense. But you hint at your response brief that it may not be a defense by saying, as you did here today, that if it is a valid defense under federal law. Has the government developed that argument at all that this court should not consider involuntary intoxication a defense at all? Well, in terms of in the government's brief, the government cites a couple of Supreme Court cases that indicates that there's a movement, slight movement at least, away from certain common law defenses. And I know yesterday before a different panel in the Psaki case, there was a question about whether in a voluntary manslaughter context, a common law restriction on voluntary manslaughter would survive. And I know at least one judge seemed to contest that. But as it relates to imperfect self-defense, it's not some sort of super diminished capacity. And this court's case law on imperfect self-defense has distinguished between cases involving gross negligence or criminal negligence and cases involving intentional acts. So, for example, as far as I can tell, the court first recognized imperfect self-defense in the Begay case in 1987. And in that case, the defendant was, in fact, was assaulted. He responded by stabbing the person who was assaulting him one time, didn't intend to kill him, but the person died. And the court determined that that was criminal negligence and justified the instruction. Similarly, I think the most recent case from this court, published case on imperfect self-defense, is the Mary Boy case. And in that case, there was a confrontation between two people outside of a vehicle. And there was evidence that the defendant discharged the gun accidentally when he was trying to fire a warning shot, but struck the victim and killed him. That was a criminal negligence context. Similarly, in the Brown case, which involved a defendant misperceiving a situation in the bathroom where his sister was, he thought, was being assaulted by another man. And so to contrast that... Why does that counsel against getting the instruction here? Because this was a premeditated case, just as in the Walker case, for example, where a defendant walked up to a victim who was seated in a vehicle. They had been in a confrontation 20-something minutes earlier. He walked up to the victim seated in a vehicle and stabbed him in the heart. And this court determined... Isn't the theory here that he was protecting his daughter from an abuser? Well, what he did here was he went to his neighbor's house. He lured the neighbor outside. And when the neighbor's back was turned, he shot the neighbor. And he shot the neighbor on the ground. And he shot the neighbor 10 times, including three times in the back of the head and three times in the back. And the most he ever said, the most he ever said as it relates to the incident that he thought maybe was happening in his home, was that he thought his daughter had been molested. Not that the victim was actively molesting his daughter at the time, but that he thought the victim had... So your answer to me is it's a proof problem. It's not the existence of the defense. It's the quantum of proof that's available here. Well, there's the burden of production issue, certainly. And when the district court asked defense counsel, point blank, what is the evidence to support an involuntary manslaughter or imperfect self-defense instruction here? Is it just the fact that lethal force was used? That means that there must have been some reason to use lethal force. And defense counsel said yes. And that's not enough. They didn't meet their burden of production. They didn't show that he had a subjective belief that the amount of force he used was necessary. And how could they when he's shooting the man 10 times on the ground and in the back? And they didn't meet their burden of production to show that he had a subjective belief that either he or his daughter was in imminent danger of death or great bodily harm. So they didn't satisfy their burden of production in that respect. Furthermore, and this is even in the defense's tendered instruction, the defense's involuntary manslaughter instruction, and that's what it was, it wasn't an imperfect self-defense instruction. It didn't list imperfect self-defense in the elements. It had imperfect self-defense referenced later on. But even the defense's tendered instruction referenced involuntary intoxication as an element. And so the involuntary manslaughter instruction was just some sort of attempted end-run around involuntary intoxication, which of course the defense would have the burden to prove. Imperfect self-defense, this Court has determined that the government has the burden of disproving beyond a reasonable doubt. However, the defense didn't object to the first-degree murder instruction. In fact, they agreed to it. So there's a strong argument, I think, that this issue is even waived. Let's circle back to the involuntary intoxication. If the prescribed Adderall was the cause of the insanity, sole cause, I know there was evidence of meth use also, but setting that aside for now, if Adderall use was the sole cause and the use was basically within either the prescription or the anticipated amounts that he might take, why would he not be entitled to an instruction if there was at least disputed evidence that the jury might have found that the Adderall caused it and he was using it within limits agreed to by his prescribing physician? And so is Your Honor's question specifically about, I think it's the fourth element, the definition of innocent mistake? In part, yeah. So I think it's important to note that there are several other elements in the involuntary intoxication instruction, such as the second element, which indicated that he used or consumed Adderall as prescribed and directed by the health care provider. And so that was separate and apart from the innocent mistake aspect of the instruction. And even the defense... How could the jury have found those elements here? Well, the jury was given the involuntary intoxication instruction, so they could have, I suppose, even though his journal entry indicated he was not using it as prescribed, he was taking more, and even though in his interview he said that he was, and this is my paraphrase, he was not compliant with his medication. When was the last time you took the medication? He said it had been a while, is what he had said. There was also evidence of prescription drift. Dr. Arambola, who was the government's expert, testified that he was filling his prescriptions early and earlier, consistent with abusing the medication. But certainly the jury could have determined that he was using it as prescribed. They didn't in this case. And the third element was that he was intoxicated by Adderall, and the jury rejected even voluntary intoxication in this case. And the fifth element that he was severely intoxicated by Adderall, and again, of course, the jury rejected that intoxication played a meaningful role in this case. Counsel, can I ask you about that point? A moment ago I asked Mr. Sanderford about whether intent to kill that element was even contested by Mr. Rainford. And I did so because I wanted to get your thoughts on the harmlessness analysis. And because Mr. Rainford is arguing that the jury's finding and conviction on murder one really tells us nothing about involuntary intoxication finding or lack thereof. But what are your thoughts on that? Well, I think the first degree murder conviction is very significant because there was also a voluntary intoxication instruction. If the jury had convicted him of second degree murder, maybe that argument would have a little bit more weight. But they rejected the intoxication as having a meaningful role here. And there was never really an argument from the defense, to the best of my recollection, that Mr. Rainford didn't intend to kill the victim when he shot him ten times. Well, I guess that's what I'm getting at. The voluntary intoxication aspect of the murder one instruction only went to the intent to kill. So if that's not in dispute, then how does a jury not finding voluntary intoxication really have anything to do with its decision regarding involuntary intoxication? That's kind of what I'm stuck on. Yes, Your Honor. I think because the jury would have had to have found that he was able to form the premeditated intent to kill, despite any substance that he was using or not using, he was able to form the specific intent to kill. And he was able to have deliberated on it for some period of time. And so that goes against the idea that he was intoxicated and he didn't know the nature of what was happening, for example. And he didn't know that it was wrong. It counters against that. I think it's also worthwhile, Your Honors, for me to emphasize that this defendant didn't even have ADHD. His own expert testified he didn't have ADHD. The BOP psychologist testified he didn't have ADHD. And ADHD, if real, would not just disappear. And so we had, you know, the evidence in this case was this was a former competitive bodybuilder. We had Facebook posts indicating, you know, where he stated he had never been so focused on the science project that he was becoming. There was a documented history of his abusing the drugs. You know, there was a counsel for Mr. Rainford in his argument said that Ms. Horn, who was the ex-wife, never confronted him about the addiction. But there was a dramatic episode where she poured out the contents of his pill bottle. Admittedly, it was Xanax, not Adderall. And she stomped on it and crushed it. And then he got down on his knees and licked it up off the ground. So this was a very this was a man who had used and abused drugs for a long period of time. He had been warned about Adderall from a number of sources. Even Dr. Kirk, the doctor who was prescribing these large quantities, even he told him that he was going to cut the dose back. And he did. And then he gave the defendant more. So, you know, our theory at trial was never, you know, that Dr. Kirk was doing right or not doing right. It was that the defendant knew what he was getting. He found a doctor who was going to give him what it was that he wanted. And then he abused the drugs that he got for his reasons. And so, you know, the involuntary intoxication instruction, we think, was correct as a matter of law. And certainly any error would have been would have been harmless. I do want to just in my last minute mention the closing argument issue. So there was a PowerPoint that defense counsel was utilizing, and it's referenced on page 1325 of the trial transcript. But it wasn't included in the record. And that's something that would have been solely in the possession of the defense. But they didn't include it in the record on appeal. The docket entry, the district court docket entry 142 specifically told defense counsel not to refer to the BOP psychologist as the government's expert or the court's expert. But he was he was throughout the case, there was an attempt to bolster the BOP psychologist. It wasn't just the Bureau of Prison psychologist. It was the Department of Justice Bureau. I'm so sorry. Did the PowerPoint say that Dr. Johnson was the court's expert? Is that what you're getting at? So the the only thing in the record and your honor, I see that I'm about to run out of time. Responding to his question. Okay. The only thing in the PowerPoint that's in the record is a reference on page 1325 that it would be easier to accept if it was just some sort of extemporaneous speech. But when there's a PowerPoint on it, so that certainly would imply that there was a misstatement in the PowerPoint, which had been prepared ahead of time. And for those reasons, the government respectfully requested the court affirm. Thank you. I'd like to start with the question that you asked Judge Federico about intent and involuntary intoxication. So a finding of intent doesn't preclude a finding that the defendant was insane. They're two completely separate things. The guy who shot Ronald Reagan, I forgot his name, he was trying to kill him, but he was insane at the time. So knowing the difference between right and wrong is different from being able to act intentionally, which is why the jury was required to go through, find him guilty of murder before going to involuntary intoxication. If he was insane due to taking medications that he was prescribed, and as a result didn't know right from wrong, he's excused from the intentional killing. So these are two separate things, and I don't think it bears on harmlessness. I'd also point out on harmlessness on the involuntary intoxication that the government doesn't argue harmlessness due to overwhelming evidence in its brief. They point to this voluntary intoxication instruction, and they point to the existence of the insanity instruction. I don't want to spend time talking about that right now unless you have questions, because it's all in our reply brief, but we have responses to those, and they have waived any argument about overwhelming evidence. They did not make that anywhere in their brief. Going to imperfect self-defense, I think your question, Judge Stemkevich, about whether there's an adequate factual basis for this, there is an adequate factual basis, and I want to stress how minimal it needs to be. You view the evidence in the light most favorable to the defense. It's just whether the jury could have a reasonable doubt about it. Even if the evidence is weak and contradicted, the instruction has to be given. And what we have here is his statements during the interrogation where he says, I thought this man was in my house. He had raped my daughter. I acted to protect her. I think I shot him in my house. The jury could infer from that, looking at it in the light most favorable to him, that in his psychotic, delusional state, he truly believed that he was defending his daughter. He was clearly wrong about that. Clearly wrong about that. Wouldn't that interpretation, though, really kind of swallow the involuntary intoxication and insanity defenses and really be an end run around those?  No, I don't think so at all. And if you look at the—they have different elements, different doctrinal underpinnings. It doesn't make him not guilty. It makes him guilty of a lesser offense. And if you look at the cases, these are all defendants who were intoxicated, voluntarily intoxicated. The defendant in Brown was high on meth. The defendant in Britt had been on a drinking binge for like three days. In that intoxicated state, he subjectively believed in this threat, even though the threat didn't exist. He's entitled to the instruction. And it doesn't get him off scot-free. It just means he's guilty of involuntary manslaughter instead of murder. Thanks. Thank you, Counselor. We appreciate it. Counselor excused. The case is submitted.